UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORDAN MEADOW,<br><br>Defendant. | **SEALED INDICTMENT**<br><br>23 Cr.<br><br>**23 CRIM 313** |

### COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury Charges:

### Overview of the Insider Trading Scheme

1. From at least in or about March 2021 through in or about May 2022, JORDAN MEADOW, the defendant, used inside information stolen from a major investment bank in New York City (the "Investment Bank") to make millions of dollars in illegal profits trading stock on behalf of himself and his clients. At all times relevant to this Indictment, MEADOW was a registered broker who worked at a brokerage firm based in New York, New York (the "Brokerage Firm"). In or about late 2020, MEADOW offered and agreed to provide items of value to a friend, Steven Teixeira, in exchange for material non-public information ("MNPI") that Teixeira obtained by secretly accessing confidential work documents on a personal laptop computer (the "Laptop") belonging to Teixeira's then girlfriend, an executive assistant at the Investment Bank (the "Executive Assistant"). The documents on the Laptop contained MNPI about planned corporate acquisitions in which the Investment Bank served as an advisor. In violation of the trust his girlfriend had placed in him, Teixeira stole that information so that he and others, including MEADOW, could use it to enrich themselves by trading in the stock market. In exchange for receiving this MNPI from Teixeira, MEADOW agreed to provide compensation, such as Rolex

watches, to Teixeira and their mutual friend ("Friend-1"), who also received the MNPI from Teixeira, traded on it, and shared it with MEADOW.

2. JORDAN MEADOW, the defendant, was well-aware of the source of the information and that it was wrongfully obtained. During an in-person meeting between MEADOW, Teixeira, and Friend-1, in or around March 2021, Teixeira explained to MEADOW in substance and in part that his girlfriend worked at an investment bank in the mergers and acquisitions division and that Teixeira had been misappropriating MNPI regarding planned corporate mergers and acquisitions by accessing his girlfriend's work documents on her Laptop without her knowledge. MEADOW began to execute trades based on this MNPI within four days of this meeting.

3. In or around late July 2021, Teixeira secretly accessed confidential work information on the Laptop and learned that in less than a week, Penn National Gaming, Inc. ("Penn National"), was going to acquire Score Media and Gaming Inc. ("Score"), a Canadian digital media company that was at the time listed on the Nasdaq Stock Market, for approximately $2.2 billion. Teixeira immediately began to purchase call option contracts in Score based on this MNPI and also told several friends to purchase Score's stock, including Friend-1. Friend-1 in turn purchased call option contracts in Score on the basis of this MNPI, and shared the MNPI with JORDAN MEADOW, the defendant, who purchased in excess of 769 call option contracts in Score between August 2, 2021, and August 3, 2021, on the basis of the MNPI. MEADOW also advised a colleague at the Brokerage Firm (his "Colleague") to purchase call options in Score stock and advised Brokerage Firm clients (the "Clients") to purchase Score stock. In addition, MEADOW advised his friend ("MEADOW's Friend") to purchase call options in Score stock.

4. After Penn National's acquisition of Score was announced publicly, and the Score holdings of JORDAN MEADOW, the defendant, his Colleague, the Brokerage Firm Clients, and MEADOW's Friend significantly increased in value, they sold their holdings in Score for significant profits. Specifically, MEADOW earned approximately $637,000 in profits, his Colleague earned approximately $484,000 in profits, the Brokerage Firm Clients earned nearly $5 million in profits, and MEADOW's Friend earned more than $38,000 in profits. In addition, MEADOW and his Colleague earned approximately $500,000 in commissions based on their Clients' profits from their Score trades.

5. Later, in or around early March 2022, Teixeira secretly accessed confidential work information on his then girlfriend's laptop and learned about a planned corporate acquisition of VMWare, an enterprise software company, for approximately $65 billion. Soon thereafter, Teixeira began to purchase call option contracts in VMWare based on this MNPI and also told several friends to purchase VMWare stock, including Friend-1. Friend-1 in turn purchased call option contracts in VMWare based on this MNPI, and shared the MNPI with JORDAN MEADOW, the defendant, who purchased over 5,000 shares of VMWare stock, as well as call options contracts in VMWare, between May 9, 2022, and May 18, 2022. MEADOW also advised his Colleague to purchase VMWare stock and call options contracts in VMWare.

6. On or about May 22, 2022, there was public reporting that Broadcom was in talks to acquire VMWare. After that public reporting, the VMWare holdings of JORDAN MEADOW, the defendant, and MEADOW's Colleague, significantly increased in value, and they began to sell their VMWare holdings for significant profit. Specifically, MEADOW earned approximately $93,079 in illegal profits, while MEADOW's Colleague earned nearly $47,000 in profits based on these trades.

**Relevant Individuals and Entities**

7.   As of July 2021, Score was a leading digital media and sports betting and technology company based in Canada, the shares of which were publicly traded on the Nasdaq Stock Market and the Toronto Stock Exchange.

8.   At all times relevant to this Indictment, Penn National was a publicly traded company that was headquartered in Pennsylvania, the shares of which were listed on the Nasdaq Stock Market.

9.   As of March 2022, Broadcom was a publicly traded global technology company based in California that designed, developed, and supplied semiconductor and infrastructure software solutions, the shares of which were listed on the Nasdaq Stock Market.

10.   At all times relevant to this Indictment, VMWare was a publicly traded company based in California that specialized in enterprise software, the shares of which were listed on the New York Stock Exchange ("NYSE").

11.   At all times relevant to this Indictment, the Executive Assistant worked in the investment banking division of the Investment Bank, which was an investment bank and financial services company headquartered in New York, New York.

12.   At all times relevant to this Indictment, JORDAN MEADOW, the defendant, and his Colleague, were registered brokers who worked as Executive Directors at the Brokerage Firm.

**Teixeira Gains Access to MNPI from the Executive Assistant's Laptop**

13.   In or about the summer of 2020, the Executive Assistant moved into an apartment with Teixeira in Queens, New York. At the time, Teixeira and the Executive Assistant were working from home at their shared apartment (the "Apartment") due to COVID-19 pandemic restrictions. Typically, Teixeira worked from a second bedroom that was set up as an office, and

4

the Executive Assistant worked from the primary bedroom. The Investment Bank did not provide the Executive Assistant with an Investment Bank-issued laptop or a work phone. As a result, the only way for the Executive Assistant to access her work emails and/or electronic work files was to log in to a remote work desktop (the "Remote Desktop") using her personal laptop computer. In order to access the Remote Desktop on her personal laptop computer, the Executive Assistant had to enter a series of login credentials into the Laptop.

14. Throughout this work from home period, the Executive Assistant routinely left her Laptop unattended. Moreover, often when the Executive Assistant engaged in routine activities around the Apartment, she left the Laptop signed on to her Remote Desktop. The Executive Assistant also regularly attended fitness classes during the workweek or did other errands. During those periods, the Executive Assistant asked Teixeira to periodically check her email on her Laptop to ensure that the Executive Assistant did not miss any time-sensitive emails from work. Because the Executive Assistant was in a long-term relationship with Teixeira, fully trusted him, planned to marry him, and had shared other personal and work confidences with him, she did not believe he would misuse any information that he saw on her Laptop and/or Remote Desktop.

15. To help ensure that the Executive Assistant did not miss any time-sensitive emails while she was out of the Apartment, Teixeira accessed the Executive Assistant's work email in several ways. On certain occasions, the Executive Assistant provided Teixeira with her Remote Desktop login credentials so that he could log in to her Remote Desktop. Teixeira also purchased a so-called "mouse jiggler" that ensured that the Executive Assistant's laptop would not lock when it was not in use. Specifically, if Teixeira placed the mouse on the mouse jiggler, it would periodically move the mouse, thereby preventing the Laptop from falling asleep and locking him

out of the computer. Teixeira also sometimes manually moved the Executive Assistant's mouse to prevent her Remote Desktop from locking.

16. In or about late 2020, Teixeira began to access the Executive Assistant's Laptop without her knowledge or permission for the purpose of stealing MNPI about planned corporate acquisitions. Specifically, Teixeira accessed the Executive Assistant's Remote Desktop and reviewed her Microsoft Outlook calendar for invitations to upcoming meetings that the investment bankers with whom she worked were invited to attend. These calendar invitations typically contained single-page PDF attachments that provided a summary of corporate mergers and/or acquisitions that were in the process of being negotiated on behalf of the Investment Bank's clients ("Deal Sheets"). For example, the Deal Sheet for the Score transaction stated, among other things, that Penn National was seeking to acquire 100% of Score for $36 per share, the estimated deal size was $2.2 billion, and the expected public announcement date was August 5, 2021. All this information was non-public at the time Teixeira misappropriated it from the Executive Assistant's Laptop.

## The Insider Trading Scheme

17. In or around early 2021, Teixeira told two of his friends, Friend-1 and Friend-2, that he had misappropriated MNPI from the Executive Assistant's Laptop. In separate conversations, Teixeira explained to each of them how he was accessing the MNPI and stressed the importance of hiding his conduct from the Executive Assistant. Teixeira also shared MNPI taken from the Laptop about planned acquisitions with Friend-1 and Friend-2, separately, on multiple occasions. Teixeira also shared MNPI that he misappropriated from the Laptop with other friends.

18. In or around March 2021, Teixeira and Friend-1 began to share MNPI about a series of planned corporate acquisitions that he had misappropriated from the Laptop with JORDAN MEADOW, the defendant. Earlier, Friend-1 had told Teixeira, in substance and in part, that MEADOW would pay for the MNPI. Friend-1 also told Teixeira, in substance and in part, that MEADOW and his business partner (his Colleague) would provide Friend-1 and Teixeira with Rolex watches in exchange for the MNPI. Although MEADOW agreed to provide Teixeira and Friend-1 with compensation, he never did.

*MEADOW Discusses the Insider Trading Scheme In-Person with Teixeira*

19. On or about March 19, 2021, JORDAN MEADOW, the defendant, Teixeira, and Friend-1 discussed the insider trading scheme in MEADOW's car (the "March 19 Car Ride"). That day, MEADOW drove to Queens, New York, picked up Teixeira and Friend-1 from the Apartment in his car, and drove them to a bar in Hoboken, New Jersey. During the car ride from Queens to Hoboken, Teixeira explained to MEADOW, in substance and in part, that the Executive Assistant worked at the Investment Bank in a mergers and acquisitions division, that she provided support to bankers as an executive assistant, and that Teixeira had been misappropriating MNPI regarding planned corporate mergers and acquisitions by accessing Deal Sheets on her Laptop without her knowledge. Teixeira also shared details with MEADOW about a planned corporate acquisition in which Paper Excellence, a global manufacturer of pulp and specialty, printing, writing, and packaging papers planned to acquire Domtar (ticker symbol "UFS"), a leading provider of fiber-based products. In this regard, Teixeira told MEADOW, among other things, the estimated public announcement date and the buyout price for the Domtar deal.

*MEADOW Begins to Purchase Call Options Contracts Based on MNPI*

20. On or about March 23, 2021, JORDAN MEADOW, the defendant, began to purchase equity shares and call options contracts in a particular company ("Company-1") based on MNPI regarding a planned corporate acquisition that Teixeira had misappropriated from the Executive Assistant's Laptop and shared with MEADOW. Over the next three months, MEADOW purchased a total of approximately $454,865 in these equity shares and call options contracts. Prior to these trades, MEADOW had never purchased any Company-1 stock or Company-1 options contracts. Beginning in late March 2021, MEADOW also advised his Colleague to purchase call options contracts in Company-1, totaling nearly $32,000 in purchases. Prior to these trades, MEADOW's Colleague had never purchased any Company-1 stock or Company-1 options contracts. Ultimately, the Company-1 acquisition did not materialize, and MEADOW, MEADOW's Colleague, and Teixeira, who had also traded on the information, suffered losses on these trades.

*"Feed me": MEADOW Asks Teixeira to Provide Him With More MNPI*

21. On or about May 11, 2021, Domtar and Paper Excellence – the companies JORDAN MEADOW, the defendant, and Teixeira had discussed during the March 19 Car Ride -- publicly announced that the Paper Excellence group of companies would acquire all the issued and outstanding shares of Domtar common stock for $55.50 per share, in cash. The deal had an enterprise value of approximately $3 billion. On May 18, 2021, one week after the public announcement, MEADOW sent a text message to Teixeira, in which MEADOW asked Teixeira if he had seen the announcement about the Domtar deal and requested that Teixeira provide him with additional MNPI. Specifically, MEADOW wrote to Teixeira, "Yo you see UFS," followed by "Feed me." As noted above, UFS is the ticker symbol for Domtar.

*MEADOW Trades in Score Based on MNPI and Advises His Colleague and Clients to Trade in Score*

22. On or about July 29, 2021, Teixeira began to purchase call option contracts in Score, based on MNPI that Teixeira had misappropriated from the Laptop. On or about that same day, July 29, 2021, Teixeira began to share this MNPI about the Score deal with Friend-1.

23. The following day, on or about July 30, 2021, Friend-1 purchased 18 call options contracts in Score stock that were identical to the strike price, expiration date, and contract purchase price of the options contracts that Teixeira had purchased earlier that same day. Friend-1 made these transactions during a call with Teixeira, during which Teixeira told Friend-1 what Score call options Friend-1 should purchase.

24. That same day, Friday, July 30, 2021, Friend-1 also spoke with JORDAN MEADOW, the defendant by phone, and shared the MNPI with MEADOW about the Score deal. In addition, that same day, MEADOW caused his friend ("MEADOW's Friend") to begin to purchase call options contracts in Score. Also on that same day, MEADOW caused a Client to purchase Score stock.

25. On or about Monday, August 2, 2021, JORDAN MEADOW, the defendant, and MEADOW's Colleague began to purchase call options contracts in Score stock in their own accounts. During a call with MEADOW's Colleague, MEADOW purchased call options contracts in Score stock, all of which were out-of-the-money options contracts.[1] The call options contracts MEADOW's Colleague, Friend-1, and Teixeira purchased all had expiration dates of August 20, 2021, and similar strike prices. In addition, that same day, MEADOW and MEADOW's Colleague advised various clients of MEADOW and MEADOW's Colleague (or joint clients of

---

[1] A call option is "out of the money" when the underlying stock price is trading below the strike price of the call option.

9

MEADOW and MEADOW's Colleague) at the Brokerage Firm to purchase Score stock, which resulted in their clients purchasing a total of approximately 164,800 shares of Score stock.

26. The following day, on or about August 3, 2021, JORDAN MEADOW, the defendant, continued to purchase additional out-of-the-money call options contracts in Score stock based on MNPI that Teixeira had misappropriated from the Executive Assistant. In addition, on that same day, MEADOW and MEADOW's Colleague engaged in multiple phone calls with clients of either MEADOW, MEADOW's Colleague, or their joint clients at the Brokerage Firm, and caused them to purchase an additional approximately 143,300 shares of Score stock.

27. The following day, on or about August 4, 2021, JORDAN MEADOW, the defendant, and MEADOW's Colleague caused Brokerage Firm Clients to purchase an additional approximately 46,880 shares of Score stock.

28. On or about August 5, 2021, at approximately 7:01 a.m., Penn National and Score publicly announced that Penn National would acquire Score in a cash and stock transaction valued at approximately $2 billion. The public announcement on August 5, 2021, of Penn National's planned acquisition of Score caused Score's stock price to rise considerably. Specifically, on August 4, 2021, the day before the announcement, Score's stock closed at a price of approximately $18.14 per share. The following day after the public announcement, Score's stock opened at a share price of approximately $29.55 and rose to an intraday high of approximately $33.22, closing at a share price of $32.64, representing nearly an 80% increase.

29. Following the August 5, 2021 announcement, shortly after the 9:30 a.m. market open, JORDAN MEADOW, the defendant, MEADOW's Colleague, Teixeira, and Friend-1 all sold out of their positions in Score stock for a substantial profit. Later that day, MEADOW's Friend also sold out of some of his positions in Score. In total, MEADOW realized approximately

$637,000 in profits, MEADOW's Colleague realized approximately $484,000 in profits, and MEADOW's Friend realized approximately $38,000 in profits. In addition, the clients of MEADOW and MEADOW's Colleague earned profits of nearly $5 million from the sale of their Score stock, and MEADOW and MEADOW's Colleague earned approximately $500,000 commissions on these trades.

*MEADOW Trades in VMWare Based on MNPI and Causes His Colleague to Trade in VMWare*

30.  On or about March 3, 2022, Teixeira purchased a call option contract in VMWare stock based on MNPI regarding a planned corporate acquisition involving VMWare that Teixeira had misappropriated from the Laptop. Approximately a month later, on or about April 4, 2022, Friend-1 purchased 45 call options contracts in VMWare stock based on this MNPI. Beginning on or about May 9, 2022, and continuing until on or about May 18, 2022, JORDAN MEADOW, the defendant, purchased more than 5,000 shares of VMWare stock as well as call options contracts in VMWare stock for a total of more than $500,000 based on this MNPI. MEADOW also caused MEADOW's Colleague to purchase approximately 10,000 options contracts in VMWare stock on or about May 11, 2022.

31.  On or about Sunday, May 22, 2022, there was public reporting that Broadcom was in discussions to acquire VMWare. The preceding Friday, May 20, 2022, VMWare's stock closed at a price of approximately $95.71 per share. On Monday, May 23, 2022, the next available trading day after the news story broke about Broadcom's planned acquisition, VMWare's stock opened at a share price of approximately $113.31 and rose to an intraday high of approximately $125.87, closing at a price of approximately $119.43. VMWare's trading volume also increased by approximately 1,200% between May 20, 2022 and May 23, 2022.

32.     Following the announcement about the planned corporate acquisition of VMWare, on the next trading day, May 23, 2023,[2] JORDAN MEADOW, the defendant, and MEADOW's Colleague began to sell their holdings in VMWare for a significant profit. In total, MEADOW made approximately $93,079 in illegal profits based on these trades on May 23, 2023, and MEADOW's Colleague earned nearly $47,000 in profits.

*MEADOW Meets with Friend-1 and Tells Friend-1 He Needs "Another Big Score"*

33.     On or about January 18, 2023, Friend-1 and JORDAN MEADOW, the defendant, met in person. During that meeting, which was recorded, MEADOW and Friend-1 discussed, among other things, the Rolex watches that MEADOW had agreed to give Friend-1 and Teixeira in exchange for the MNPI about planned acquisitions that Teixeira had misappropriated from the Executive Assistant. In substance and in part, MEADOW stated that he should probably sell some of his watches, and in response Friend-1 stated that MEADOW should give him the watches as "payment." Later in the conversation, MEADOW stated, among other things, that he "need[ed] another like big score," and that he "need[ed] something right now."

*MEADOW and Friend-1 Text About the Rolex That MEADOW Owed Friend-1 and Teixeira*

34.     On or about April 29, 2023, JORDAN MEADOW, the defendant, and Friend-1 exchanged a series of text messages, including messages in which MEADOW and Friend-1 discussed the Rolex watch that MEADOW owed as payment for the MNPI that Friend-1 and Teixeira had provided to MEADOW. An image of these text messages is shown below, with MEADOW's messages in grey on the left side (including the image of the Rolex), and Friend-1's messages in blue on the right side:

---

[2] Because the NYSE is closed on Sundays, the first available trading day after the news broke about Broadcom's potential acquisition of VMWare was Monday, May 23, 2022.

12



## STATUTORY ALLEGATIONS

35.     From at least in or about November 2020 up to and including at least in or about April 2023, in the Southern District of New York and elsewhere, JORDAN MEADOW, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (i) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and (ii) securities fraud, in violation of Title 18, United States Code, Section 1348.

36. It was a part and object of the conspiracy that JORDAN MEADOW, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, would and did use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulation, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Section 78j(b) and 78ff.

37. It was further a part and object of the conspiracy that JORDAN MEADOW, the defendant, and others known and unknown, would and did knowingly execute, and attempt to execute, a scheme and artifice to (a) defraud a person in connection with a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, in violation of Title 18, United States Code, Section 1348.

## Overt Acts

38.     In furtherance of the conspiracy and to effect its illegal objects, the following overt acts, among others, were committed in the Southern District of New York and elsewhere: on or about March 19, 2021, JORDAN MEADOW, the defendant, had a conversation in his car with Teixeira and Friend-1, during which, among other things, Teixeira shared confidential MNPI about Paper Excellence's planned acquisition of Domtar, including the estimated announcement date for the deal and the buyout price.

(Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH SEVEN
### (Securities Fraud)

The Grand Jury further charges:

39.    The allegations contained in paragraphs 1 through 34 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

40.    On or about the dates set forth below, in the Southern District of New York and elsewhere, JORDAN MEADOW, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulation, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, knowing of Teixeira's breach of his duties of trust and confidence to the Executive Assistant, MEADOW executed and caused others to execute the securities transactions listed below on or about the dates listed below:

| Count | Trade Date(s) | Transactions |
|---|---|---|
| 2 | July 30, 2021 | Purchase of Score (SCR) call options by MEADOW's Friend |
| 3 | August 2-3, 2021 | Purchase of Score (SCR) call options by JORDAN MEADOW |
| 4 | July 30-August 4, 2021 | Purchase of Score (SCR) stock in Brokerage Firm client accounts |
| 5 | August 2, 2021 | Purchase of Score (SCR) call options by MEADOW's Colleague |

| | | |
|---|---|---|
| 6 | May 10-18, 2022 | Purchase of VMWare (VMW) call options and shares of VMWare by JORDAN MEADOW |
| 7 | May 11, 2022 | Purchase of VMWare (VMW) call options and shares of VMWare by MEADOW's Colleague |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.10b5-1, and 240.10b5-2; and Title 18, United States Code, Section 2.)

## COUNT EIGHT
### (Securities Fraud)

The Grand Jury further charges:

41. The allegations contained in paragraphs 1 through 34 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

42. Between in or about November 2020 up to and including at least in or about April 2023, in the Southern District of New York and elsewhere, JORDAN MEADOW, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to (a) defraud a person in connection with a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, MEADOW committed insider trading by using stolen inside information that Teixeira embezzled from his then girlfriend to make profitable securities trades and by tipping others.

(Title 18, United States Code, Sections 1348 and 2.)

## FORFEITURE ALLEGATION

43. As a result of committing one or more of the offenses charged in Counts One through Eight of this Indictment, JORDAN MEADOW, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Seven, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

### Substitute Assets Provision

44. If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461.)

_____  
FOREPERSON

_____  
DAMIAN WILLIAMS  
United States Attorney